[3.2013 prospective cell site/GPS warrant]
NMA:NS
F.#2013R00786

# 13 MISC 684

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

IN THE MATTER OF AN APPLICATION
OF THE UNITED STATES OF AMERICA
FOR ORDERS AUTHORIZING THE
DISCLOSURE OF LOCATION DATA
RELATING TO SIX SPECIFIED
WIRELESS TELEPHONES

- - - - - - - - - - - - - - - - X

**FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT OF
APPLICATION
(Fed. R. Crim. P. 41; T. 18,
U.S.C., §§ 2703(c)(1)(A),
3103a and 3117; T. 28,
U.S.C., § 1651(a))

EASTERN DISTRICT OF NEW YORK, SS:

I, SEAN OLSEWSKI, being first duly sworn, hereby depose
and state as follows:

1.     I make this affidavit in support of an
application for search warrants under Federal Rule of Criminal
Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) for information about
the location of (1) the cellular telephone assigned call number
(347) 392-0246, subscribed to by BESNIK LLAKATURA, 186 Jefferson
Avenue, Staten Island, New York 10306, ("SUBJECT TELEPHONE 1"),
whose wireless telephone service provider is Sprint; (2) the
cellular telephone assigned call number (516) 423-3813,
subscribed to by DENIS NIKOLLA, 161 Utica Avenue, Apartment 2G,
Brooklyn, New York 11213 ("SUBJECT TELEPHONE 2"), whose wireless
telephone provider is Sprint; (3) the cellular telephone assigned
call number (516) 423-1788, subscribed to by DENIS NIKOLLA, 161
Utica Avenue, Apartment 2G, Brooklyn, New York 11213, ("SUBJECT
TELEPHONE 3"), whose wireless service provider is Sprint; (4) the

cellular telephone assigned call number (646) 764-4283, used by
DENIS NIKOLLA, ("SUBJECT TELEPHONE 4"), whose wireless service
provider is T-Mobile; (5) the cellular telephone assigned call
number (646) 894-7578, used by REDINEL DERVISHAJ, ("SUBJECT
TELEPHONE 5"), whose wireless service provider is T-Mobile; and
(6) the cellular telephone assigned call number (917) 500-5727,
subscribed to by "TAPAS SINY," 661 Bay Street, Staten Island, New
York 10304-3828, ("SUBJECT TELEPHONE 6"), whose wireless service
provider is MetroPCS, Inc.; (collectively, the "SUBJECT
TELEPHONES"). Sprint, T-Mobile, and MetroPCS, Inc., are
collectively referred to as the "Service Providers." The SUBJECT
TELEPHONES are described herein and in Attachments A-1, A-2 and
A-3 to the respective search warrants, and the location
information to be seized is described herein and in Attachments
B-1, B-2 and B-3 to the respective search warrants.

     2.    I have been a Special Agent with the Federal
Bureau of Investigation for approximately ten years. I am
currently assigned to Squad C-42, where I investigate emerging
organized crime groups, including Albanian organized crime
enterprises, engaged in extortion, violent robberies,
loansharking, and other offenses. These investigations are
conducted both in an undercover and overt capacity. I have
participated in investigations involving search warrants and
arrest warrants. As a result of my training and experience, I am

familiar with the techniques and methods of operation used by individuals involved in criminal activity to conceal their activities from detection by law enforcement authorities.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  Because the purpose of this affidavit is limited to demonstrating probable cause for the requested warrants, it does not set forth all of my knowledge about this matter.  In addition, when I rely on statements made by others, such statements are set forth only in part and in substance unless otherwise indicated.

4.     Based on the facts set forth in this affidavit, there is probable cause to believe that extortion and conspiracy to commit extortion, in violation of 18 U.S.C. § 1951, have been committed, and are being committed, by BESNIK LLAKATURA, DENIS NIKOLLA, REDINEL DERVISHAJ and others known and unknown.  There is also probable cause to believe that BESNIK LLAKATURA has used, and is currently using, SUBJECT TELEPHONE 1 and SUBJECT TELEPHONE 6 to engage in and facilitate extortion and conspiracy to commit extortion, that DENIS NIKOLLA has used, and is currently using, SUBJECT TELEPHONE 2, SUBJECT TELEPHONE 3 and SUBJECT TELEPHONE 4 to engage in and facilitate extortion and conspiracy to commit extortion, and that REDINEL DERVISHAJ has used, and is currently using, SUBJECT TELEPHONE 5 to engage in and facilitate extortion

3

and conspiracy to commit extortion.   There is therefore probable cause to believe that the location information, including but not limited to E-911 Phase II data (or other precise location information) concerning the SUBJECT TELEPHONES (the "REQUESTED INFORMATION"),[1] as described in Attachments B-1, B-2 and B-3 will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses, as well as victims of these offenses.

### PROBABLE CAUSE

5.    The investigation has revealed, among other things, the following.  John Doe #1, whose identity is known to the affiant, immigrated from Albania to the United States approximately ten years ago.  John Doe #1 owns a pizzeria in Little Neck, New York (hereinafter, the "Queens Pizzeria") and a seafood restaurant in Astoria, New York (hereinafter, the

---

[1] Such information shall, where other information is unavailable, include records reflecting the tower and antenna face ("cell site") used by the SUBJECT TELEPHONES at the start and end of any call or text message transmission.  In requesting cell site information, the government does not concede that such cell site records — routinely retained by wireless carriers as business records — may only be obtained via a warrant issued on probable cause.  See In re Application, 632 F. Supp. 2d 202 (E.D.N.Y. 2008) (authorizing prospective acquisition of cell-site records under combined authority of 18 U.S.C. 2703(d) & 3121 et seq.); In re Application, 460 F. Supp. 2d 448 (S.D.N.Y. 2006) (same).

"Astoria Restaurant"). John Doe #1 has advised the following, in substance and in part:

a. John Doe #1 has owned the Queens Pizzeria for approximately two years and opened the Astoria Restaurant in or about May 2013.

b. The Astoria Restaurant uses and sells food items and products that were transported from, and/or manufactured, outside the state of New York.

c. On or about the afternoon of May 11, 2013, an employee of the Queens Pizzeria informed John Doe #1 that a man had entered the Queens Pizzeria and asked to speak with John Doe #1. John Doe #1 subsequently entered the dining area of the Queens Pizzeria and spoke with the man, an Albanian male, who introduced himself as "REDINEL DERVISHAJ." During their conversation, DERVISHAJ stated that (1) John Doe #1 would have to pay DERVISHAJ $4,000 per month because John Doe #1 had recently opened the Astoria Restaurant in "our neighborhood;" (2) if John Doe #1 did not know who DERVISHAJ was, John Doe #1 should look DERVISHAJ up on the Internet;[2] (3) DERVISHAJ knew that John Doe

_____

[2] A "Google" search for "Redinel Dervishaj" results in articles from various media outlets showing photographs of DERVISHAJ and revealing the following information regarding DERVISHAJ's involvement in a fatal stabbing: According to the news articles, in or about March 2012, DERVISHAJ was arrested for stabbing Antonio Lacertosa with a butcher knife on Staten Island, New York, during Lacertosa's engagement party. Lacertosa died from his injuries. In or about April 2012, a Staten Island grand jury declined to indict DERVISHAJ for Lacertosa's murder, after

#1 had a brother who owned a liquor store in Massachusetts who "had lots of money;" and (4) DERVISHAJ was going to send two men to the Astoria Restaurant that evening and John Doe #1 needed "to take care of them."

   d. Following this encounter, on or about May 11, 2013, John Doe #1 called SUBJECT TELEPHONE 1 and spoke with his friend, BESNIK LLAKATURA, a New York City Police Department ("NYPD") officer of Albanian descent. LLAKATURA advised John Doe #1 that DERVISHAJ and others extort various Albanian establishments in Astoria and that John Doe #1 opened the Astoria Restaurant in "their neighborhood."

   e. John Doe #1 has known BESNIK LLAKATURA for many years and previously lived with LLAKATURA. As a result, LLAKATURA knows personal details regarding John Doe #1, including John Doe #1's mobile telephone number and the fact that John Doe #1's brother-in-law lives in Massachusetts and owns a liquor store there.

   f. On or about the evening of May 11, 2013, an employee of the Astoria Restaurant informed John Doe #1 that two men came to the Astoria Restaurant looking for John Doe #1 when John Doe #1 was not there. Thereafter, at approximately 10:41 pm, John Doe #1 received a call on his mobile telephone from a

---

viewing video surveillance footage of events leading up to the stabbing, which DERVISHAJ's counsel argued showed DERVISHAJ acted in self-defense.

telephone number with area code 718 (hereinafter, "718 Telephone Number 1").[3] According to John Doe #1, the person who called him from 718 Telephone Number 1 identified himself as "Redinel" and, in Albanian, reiterated that John Doe #1 had opened his restaurant in "our neighborhood" and, as a result, John Doe #1 would have to pay "us."

     g.    Prior to May 11, 2013, John Doe #1 had never met REDINEL DERVISHAJ. At no point during their May 11, 2013 encounter did John Doe #1 provide DERVISHAJ with his mobile telephone number.

     6.    Video surveillance footage captured by security cameras installed within the Queens Pizzeria corroborates John Doe #1's account of what transpired on the afternoon of May 11, 2013. The video surveillance footage shows a man entering the Queens Pizzeria at approximately 3:47 pm[4] and speaking with an employee behind the pizza counter. The employee then walks away. Approximately 25 seconds later, John Doe #1 enters the dining area from the back of the Queens Pizzeria and speaks with the man who had entered. John Doe #1 and the man sit together at a table

     [3]    Records checks reveal that 718 Telephone Number 1 belongs to a pay phone located in Astoria, New York.

     [4]    Analysis of the video surveillance footage from the Queens Pizzeria indicates that the time-stamp from the footage is an hour behind the actual time (i.e., when the video footage indicates that it is 2:47 pm, it is actually 3:47 pm). The times set forth in paragraphs 14 and 20 reflect the actual time.

in the Queens Pizzeria for a short time, after which the man exits the Queens Pizzeria.  Telephone records also confirm that John Doe #1 called the SUBJECT TELEPHONE 1 at approximately 3:53 pm on May 11, 2013.

      7.    On or about March 23, 2013, DERVISHAJ was arrested in Queens, New York on a domestic violence charge. According to the NYPD Domestic Incident Report, DERVISHAJ's phone number is (571) 337-7018 (hereinafter, the "DERVISHAJ Cell Phone").  The DERVISHAJ Cell Phone is also subscribed to by REDINAL DERVISHAJ.  Telephone records reveal that SUBJECT TELEPHONE 1 called the DERVISHAJ Cell Phone at approximately 3:13 pm on May 11, 2013 – approximately 34 minutes before DERVISHAJ visited the Queens Pizzeria on May 11, 2013 and approximately 40 minutes before John Doe #1 called LLAKATURA to inform him of the extortion threats made by DERVISHAJ.  Telephone records also reveal that the DERVISHAJ Cell Phone called SUBJECT TELEPHONE 1 on May 11, 2013, after DERVISHAJ's visit to the Queens Pizzeria, at the following approximate times: 3:49 pm, 5:58 pm, 6:08 pm, and 10:47 pm.  Based on the timing of the above-described calls, the information conveyed by DERVISHAJ to John Doe #1, and my training, experience and participation in the investigation, I believe that LLAKATURA probably knew of DERVISHAJ's plan to extort John Doe #1 prior to being informed by John Doe #1 of DERVISHAJ's threats and, further, that LLAKATURA probably aided

the extortion plan by providing DERVISHAJ with (1) personal
information regarding John Doe #1's brother-in-law, which
DERVISHAJ conveyed to John Doe #1 during the May 11, 2013
meeting; and/or (2) John Doe #1's mobile telephone number, which
DERVISHAJ used to call John Doe #1 from 718 Telephone Number 1 on
the evening of May 11, 2013. Based on my participation in the
investigation, and my training and experience, I further believe
that DERVISHAJ called LLAKATURA immediately following his May 11,
2013 meeting with John Doe #1 and immediately following his 10:43
pm phone call to John Doe #1 to, inter alia, convey to LLAKATURA
what transpired during the meeting and phone call, respectively.

      8.    According to John Doe #1, on or about the
evening of May 12, 2013, John Doe #1 closed the Queens Pizzeria,
got into his vehicle and began driving home. As John Doe #1 was
driving, he noticed a white Chevy Malibu sedan (hereinafter, the
"Chevy Malibu") following his vehicle. Thereafter, John Doe #1
observed DERVISHAJ get out of the Chevy Malibu, knock on the
front driver's side window of John Doe #1's vehicle and state the
following, in Albanian, in substance and in part: "What happened?
You think you're a tough guy? You think you have balls of steel?
I want $4,000 for the restaurant per month." DERVISHAJ further
stated that John Doe #1's restaurant was going to be a "gold
mine" and that John Doe #1 had to pay "us." John Doe #1 reported
the license plate number of the Chevy Malibu to law enforcement

personnel.   Records checks reveal that the Chevy Malibu is registered to DERVISHAJ at an address in Queens, New York. Telephone records reveal that (1) the DERVISHAJ Cell Phone called SUBJECT TELEPHONE 1 at approximately 1:56 pm and 5:20 pm on May 12, 2013; and (2) SUBJECT TELEPHONE 1 called the DERVISHAJ Cell Phone at approximately 8:29 pm on May 12, 2013.

9.     According to John Doe #1, on or about May 14, 2013, at approximately 8:30 pm, John Doe #1 noticed the Chevy Malibu on the streets of Astoria, Queens.  At approximately 10:30 pm, John Doe #1 saw DERVISHAJ park the Chevy Malibu across the street from the Astoria Restaurant and walk towards the Astoria Restaurant.   Thereafter, DERVISHAJ again demanded money from John Doe #1. John Doe #1 told DERVISHAJ that he was not making any money from the Astoria Restaurant, as he had not yet received his liquor license.  DERVISHAJ nonetheless continued to demand payment, telling John Doe #1, in substance and in part, "you have to take care of us."  Telephone records reveal that the DERVISHAJ Cell Phone called SUBJECT TELEPHONE 1 at approximately 8:04 pm, 8:22 pm, and 11:02 pm on May 14, 2013.  Based on my training and experience, and the timing of these calls, I believe that DERVISHAJ called LLAKATURA to discuss the extortion of John Doe #1.

10.     Telephone records further reveal that between May 17, 2013 and July 3, 2013, SUBJECT TELEPHONE 1 and the DERVISHAJ Cell Phone were in contact approximately 29 times.

11.     Following the receipt of information from John Doe #1 regarding the extortionate threats he received in May 2013, law enforcement agents took various investigative steps, including setting up pole cameras outside the Queens Pizzeria and the Astoria Restaurant, obtaining telephone records, conducting records checks, and attempting to locate video surveillance footage to corroborate the information received from John Doe #1. John Doe #1 has advised that he did not receive extortionate threats following the May 14, 2013 incident described above until in or about July 2013.  More specifically, John Doe #1 has advised the following, in substance and in part:

a.     On or about the evening of July 6, 2013, John Doe #1 closed up the Queens Pizzeria.  As John Doe #1 exited the Queens Pizzeria and proceeded towards his vehicle, which was parked in a driveway behind the Queens Pizzeria, John Doe #1 noticed a black Dodge Charger vehicle (hereinafter, the "Dodge Charger") also parked on a side street behind the Queens Pizzeria.

b.     John Doe #1 pulled out of the driveway and turned left onto the street, at which point he noticed at least three men inside the Dodge Charger.  Thereafter, the Dodge

11

Charger began following John Doe #1's vehicle. John Doe #1 noticed that the Dodge Charger did not have a front license plate.

        c.   John Doe #1, who was driving on a narrow residential street, subsequently attempted to make a U-turn in an effort to see the Dodge Charger's rear license plate. As John Doe #1 did so, his vehicle ended up nose-to-nose with the Dodge Charger, at which point John Doe #1 reversed his vehicle for approximately half a block and attempted to turn his vehicle around. John Doe #1 was unable to turn his vehicle around, however, as his vehicle was too close to a street pole on the corner. At this point, the driver of the Dodge Charger exited the Dodge Charger carrying a gun, ran towards John Doe #1's vehicle, and pointed his gun at John Doe #1, while yelling at John Doe #1. John Doe #1 managed to escape the area and drove away.

        d.   John Doe #1 has identified a photograph of DENIS NIKOLLA as the driver of the Dodge Charger who pointed a gun at John Doe #1 on July 6, 2013.

        12.   Video surveillance footage in and around the Queens Pizzeria shows that John Doe #1 closed the Queens Pizzeria on July 6, 2013 at approximately 11:27 pm. Video surveillance footage also shows that a black Dodge Charger drove by the Queens Pizzeria at approximately 9:47 pm, and was outside the front

entrance of the Queens Pizzeria from approximately 10:00 pm to 10:10 pm. Within the next hour, the video surveillance footage further shows a black Dodge Charger drive by the Queens Pizzeria several times onto a side street. The black Dodge Charger captured by the video surveillance footage had no front license plate.

13. Records checks reveal that a black Dodge Charger is registered to DENIS NIKOLLA in Florida. A check of the NYPD's Real-Time Crime Center License Plate Reader database indicates that the Dodge Charger registered to NIKOLLA has been captured on license plate reader cameras in New York City multiple times in July 2013.

14. According to John Doe #1, shortly after the above-described incident with the Dodge Charger, at approximately 12:23 am on July 7, 2013, John Doe #1 received a phone call on his mobile telephone from DERVISHAJ, using a telephone number beginning with area code 718 (hereinafter, "718 Telephone Number 2").[5] According to John Doe #1, DERVISHAJ informed John Doe #1, in Albanian and in substance and in part, that DERVISHAJ had not forgotten about John Doe #1, that he knew what was going on and that John Doe #1 "got lucky this time." Based on my participation in the investigation, and my training and

---

[5] Telephone records reveal that 718 Telephone Number 2 belongs to a pay phone located in Astoria, New York, located approximately 0.6 miles from the Astoria Restaurant.

experience, I believe that DERVISHAJ's statement that John Doe #1 "got lucky this time" was a reference to John Doe #1 having been able to escape unharmed, despite NIKOLLA's having pointed a gun at him.

15.     As noted above, telephone records indicate that SUBJECT TELEPHONE 2 is a mobile telephone issued by Sprint and subscribed to by DENIS NIKOLLA.  Telephone records further show that on July 6, 2013 – the date that NIKOLLA displayed a gun to John Doe #1 – SUBJECT TELEPHONE 2 was in contact with the DERVISHAJ Cell Phone leading up to the gun incident at the following approximate times: 2:49 pm, 2:50 pm, 3:04 pm, 6:24 pm, 6:57 pm, 7:31 pm, and 8:36 pm.  Telephone records also show that SUBJECT TELEPHONE 2 was in contact with the DERVISHAJ Cell Phone following DERVISHAJ's 12:23 am call with John Doe #1 on July 7, 2013 at the following approximate times: 3:56 am, 7:55 pm, 8:04 pm, 8:25 pm, 8:35 pm, and 10:43 pm.  Based on the timing of these calls, my participation in the investigation, and my training and experience, I believe these calls related to the gun incident.

16.     At approximately 6:33 pm on July 7, 2013, LLAKATURA sent John Doe #1 a text message from SUBJECT TELEPHONE 1, which stated "U are in deep shit u know.  I dont want ur problems to become mine," which law enforcement agents have viewed on John Doe #1's mobile telephone and which telephone records confirm was sent from SUBJECT TELEPHONE 1.  Telephone

14

records further reveal that (1) the DERVISHAJ Cell Phone called
SUBJECT TELEPHONE 1 at approximately 1:32 pm, 3:12 pm, 4:44 pm,
4:51 pm, 8:26 pm, 9:05 pm, and 10:01 pm on July 7, 2013; and
(2) SUBJECT TELEPHONE 1 called the DERVISHAJ Cell Phone at
approximately 9:49 pm on July 7, 2013.  Based on the timing of
the above-described phone calls  from DERVISHAJ to LLAKATURA,
which preceded LLAKATURA's text message to John Doe #1, and my
training and experience, I believe that DERVISHAJ informed
LLAKATURA that John Doe #1 had been threatened with a gun and
that this incident was the "deep shit" LLAKATURA was referring to
in his text message to John Doe #1.

        17.    On or about July 8, 2013, at approximately 9:46
pm,[6] John Doe #1 called LLAKATURA on SUBJECT TELEPHONE 1, which
call was consensually recorded and confirmed by telephone
records.  A review of the recording reveals that, during this
call, LLAKATURA asked John Doe #1 what happened.  John Doe #1
told LLAKATURA he did not know what to do and that "they" showed
up with weapons.  LLAKATURA asked John Doe #1 where he was and
John Doe #1 indicated he was in New Jersey.  LLAKATURA advised

_____

        [6]    In a prior affidavit in support of an application for
orders authorizing the disclosure of location data relating to
the DERVISHAJ Cell Phone and SUBJECT TELEPHONE 1, sworn to by FBI
Task Force Officer Joseph Chimienti on July 16, 2013
(hereinafter, the "July 16, 2013 Location Data Affidavit"), the
start time of this call was mistakenly set forth as approximately
5:50 pm.  The correct start time of the call is approximately
9:46 pm.

John Doe #1 to stay in New Jersey and not to come to New York until tomorrow. LLAKATURA further advised John Doe #1 that he would be in Astoria tomorrow and would see what to do then.

18.    Telephone records reveal that the DERVISHAJ Cell Phone called SUBJECT TELEPHONE 1 at approximately 1:42 pm, 2:15 pm, and 5:59 pm on July 8, 2013.

19.    At approximately 9:49 pm on July 8, 2013, John Doe #1 received a text message on his mobile phone from LLAKATURA, using SUBJECT TELEPHONE 1, asking how far John Doe #1 was from LLAKATURA's house. In response, John Doe #1 sent a text message to SUBJECT TELEPHONE 1 at approximately 9:52 pm, indicating he was quite far from LLAKATURA's house. At approximately 9:53 pm, John Doe #1 received a text message reply from SUBJECT TELEPHONE 1, stating, in sum and substance, "forget it then." The content of each of these text messages has been reviewed by law enforcement agents and the time of the messages, as well as the sending and receiving telephone numbers has been confirmed by telephone records.

20.    At approximately 1:08 am on July 9, 2013, John Doe #1 received a text message on his mobile telephone from LLAKATURA, using SUBJECT TELEPHONE 1, which text message was viewed by law enforcement agents and which telephone records confirm was sent by SUBJECT TELEPHONE 1. The text message advised John Doe #1 to tell the manager of the Astoria Restaurant

16

to be careful tomorrow and not to be by himself.  Based on my participation in the investigation, and my training and experience, I believe this text message was meant to convey to John Doe #1 that DERVISHAJ and his associates intended to physically harm the manager of the Astoria Restaurant.

21.    On or about July 9, 2013, at approximately 10:19 am, John Doe #1 received a text message on his mobile telephone from LLAKATURA, using SUBJECT TELEPHONE 1, asking John Doe #1 to meet him in Staten Island, New York.  This text message has been viewed by law enforcement agents and telephone records confirm the time and sender of the text message.  Thereafter, telephone records indicate that John Doe #1 spoke with LLAKATURA on SUBJECT TELEPHONE 1.  According to John Doe #1, during their conversation, LLAKATURA provided John Doe #1 with an address in Staten Island at which John Doe #1 could meet LLAKATURA and, further, that "they" had another "crew" following John Doe #1 around and that they were "bad people."  Based on my participation in the investigation, and my training and experience, I believe LLAKATURA used the term "crew" to refer to REDINEL DERVISHAJ and others working with him and, further, was attempting to instill fear in John Doe #1 by (1) indicating that DERVISHAJ had additional associates following John Doe #1; and (2) referring to DERVISHAJ and his associates as "bad people,"

17

which I believe was meant to convey that they were capable of violence.

22.    On or about the afternoon of July 9, 2013, John Doe #1 met with LLAKATURA in Staten Island, New York, which meeting was physically surveilled by law enforcement agents.[7] John Doe #1 advised that the following transpired at the meeting, in substance and in part:

a.    LLAKATURA advised John Doe #1 that he was in a bad situation and that the individuals extorting John Doe #1 were bad people who could not be fought because they would hurt John Doe #1.

b.    LLAKATURA further advised that, on or about July 8, 2013, DERVISHAJ came to LLAKATURA's residence with two friends, one of whom was an individual LLAKATURA knew as "Altin,"[8] to discuss the amount of money they wanted from John Doe #1.  LLAKATURA stated that DERVISHAJ wanted three months' payment from John Doe #1, for the three months the Astoria Restaurant had been open, totaling $12,000, by July 11, 2013. LLAKATURA told John Doe #1 that if John Doe #1 did not pay, John Doe #1 would be physically harmed.  LLAKATURA further stated that

---

[7]    John Doe #1 was equipped with a recording device during this meeting, but the recording device malfunctioned and, as a result, the meeting was not recorded.

[8]    In the July 16, 2013 Location Data Affidavit, the name of this individual was mistakenly set forth as "Ardit."

18

the individuals extorting John Doe #1 had intended to wound John
Doe #1 by shooting him on the evening of July 6, 2013.

        c.   John Doe #1 told LLAKATURA that he could not
come up with $12,000 by July 11, 2013, and would only be able to
pay $4,000 by that date.  LLAKATURA stated that he would speak
with "them" and get back to John Doe #1.

        23.   At approximately 7:48 pm on July 9, 2013,
LLAKATURA sent a text message from SUBJECT TELEPHONE 1 to John
Doe #1 stating "U have no problem do ur things," which text
message was reviewed by law enforcement agents and which
telephone records confirm was sent from the SUBJECT TELEPHONE 1.
Based on my participation in the investigation, and my training
and experience, I believe this text message was meant to convey
to John Doe #1 that LLAKATURA had spoken with DERVISHAJ regarding
John Doe #1's ability to make a payment (as LLAKATURA indicated
he would at the conclusion of his July 9, 2013 meeting with John
Doe #1) and that John Doe #1 and/or his employees would not be
physically harmed that evening.

        24.   Telephone records indicate that, at
approximately 10:41 pm on July 9, 2013, John Doe #1 received a
telephone call on his mobile phone from SUBJECT TELEPHONE 1.
According to John Doe #1, during this phone call, LLAKATURA
indicated that he was a few blocks away from the Astoria
Restaurant and was going to pass by, which LLAKATURA thereafter

did. Video surveillance footage in and around the Astoria Restaurant shows LLAKATURA arriving at the Astoria Restaurant at approximately 10:44 pm and thereafter speaking with John Doe #1 outside the Astoria Restaurant. John Doe #1 related that the following transpired during his meeting with LLAKATURA, in substance and in part:

    a.    LLAKATURA related that two Albanian men had come to see LLAKATURA and told LLAKATURA that they had been sent by DERVISHAJ.

    b.    According to LLAKATURA, one of the Albanian men then called DERVISHAJ from his mobile telephone and handed the phone to LLAKATURA. LLAKATURA advised that DERVISHAJ told LLAKATURA that John Doe #1 must pay DERVISHAJ $6,000 by July 11, 2013 and another $6,000 by August 15, 2013, otherwise DERVISHAJ would break John Doe #1's legs. LLAKATURA offered to loan John Doe #1 $2,000 towards the $6,000 payment to DERVISHAJ due on July 11, 2013.

    25.    Telephone records reveal that (1) the DERVISHAJ Cell Phone called SUBJECT TELEPHONE 1 at approximately 3:42 pm, 3:53 pm, 9:06 pm, and 9:09 pm on July 9, 2013; and (2) SUBJECT TELEPHONE 1 called the DERVISHAJ Cell Phone at approximately 6:50 pm, 8:32 pm, 8:59 pm, 9:00 pm, and 11:39 pm on July 9, 2013. Based on the timing of these calls, my participation in the investigation, and my training and experience, I believe that

20

(1) during the calls that took place before LLAKATURA's 10:44 pm
meeting with John Doe #1, DERVISHAJ and LLAKATURA probably
discussed the terms of John Doe #1's required payments to
DERVISHAJ; and/or (2) during the 11:39 pm call following
LLAKATURA's meeting with John Doe #1, LLAKATURA probably informed
DERVISHAJ of what transpired during LLAKATURA's meeting with John
Doe #1.

26.    On or about July 10, 2013 at approximately 6:08
pm,[9] John Doe #1 called LLAKATURA on the SUBJECT TELEPHONE 1,
which call was consensually recorded and confirmed by telephone
records.  A review of the recording reveals that, during this
phone call, LLAKATURA asked John Doe #1 whether John Doe #1 would
make the cash payment to DERVISHAJ himself or whether LLAKATURA
should do so instead.  John Doe #1 stated that he wanted to meet
DERVISHAJ face-to-face.  LLAKATURA stated that he also wanted to
be present at the meeting with DERVISHAJ and advised John Doe #1
to meet LLAKATURA the next day in the afternoon.

27.    At approximately 7:11 pm[10] on July 10, 2013,
John Doe #1 called SUBJECT TELEPHONE 1 and spoke with LLAKATURA,
which call was consensually recorded and confirmed by telephone

---

[9]    In the July 16, 2013 Location Data Affidavit, the start
time of this call was mistakenly set forth as approximately 2:14
pm. The correct start time of the call is approximately 6:08 pm.

[10]   In the July 16, 2013 Location Data Affidavit, the start
time of this call was mistakenly set forth as approximately 3:23
pm. The correct start time of the call is approximately 7:11 pm.

records. A review of the recording reveals that, during the phone call, LLAKATURA and John Doe #1 discussed whether to meet with DERVISHAJ later that night or the next day. LLAKATURA told John Doe #1 that he would provide him with a $2,000 loan when they met, but that John Doe #1 would need to provide the rest of the money ($4,000). LLAKATURA and John Doe #1 ultimately agreed to meet the next day, after LLAKATURA got off from work, in Astoria, New York.

28. Telephone records reveal that (1) the DERVISHAJ Cell Phone called SUBJECT TELEPHONE 1 at approximately 4:57 pm, 5:02 pm, 5:05 pm, and 7:32 pm on July 10, 2013; and (2) SUBJECT TELEPHONE 1 called the DERVISHAJ Cell Phone at approximately 5:54 pm and 6:15 pm[11] on July 10, 2013.

29. On or about July 11, 2013 at approximately 11:33 am[12], John Doe #1 called SUBJECT TELEPHONE 1 and spoke with LLAKATURA, which call was consensually recorded and confirmed by telephone records. A review of the recording reveals that, during the call, John Doe #1 expressed concern over his safety and asked LLAKATURA if he could meet with LLAKATURA. LLAKATURA told John Doe #1 that they could meet later in the day, five

---

[11] In the July 16, 2013 Location Data Affidavit, the end time of this call (6:20 pm) was inadvertently listed as the start time of the call. The correct start time of the call is 6:15 pm.

[12] In the July 16, 2013 Location Data Affidavit, the start time of this call is mistakenly set forth as approximately 7:37 am. The correct start time of the call is approximately 11:33 am.

minutes before the meeting with DERVISHAJ, to go over any concerns John Doe #1 had.  LLAKATURA stated that he would make sure nothing happened to John Doe #1 during the meeting with DERVISHAJ.  LLAKATURA ultimately agreed to meet with John Doe #1 briefly in Staten Island, New York.

30.    On or about the afternoon of July 11, 2013, John Doe #1 met with LLAKATURA in Staten Island, New York, which meeting was consensually recorded.  John Doe #1 advised that the following transpired during the meeting, in substance and in part:

a.    LLAKATURA told John Doe #1 that John Doe #1 could open up a club with DERVISHAJ.  LLAKATURA advised that the club would be in John Doe #1's name, but DERVISHAJ would be a partner in the club.  In the event this transpired, LLAKATURA told John Doe #1 that for every $2,000 John Doe #1 made from the club, John Doe #1 would have to give DERVISHAJ $1,000.

b.    LLAKATURA stated that he had spoken with DERVISHAJ and that, as long as John Doe #1 paid DERVISHAJ, John Doe #1 would be fine.

c.    LLAKATURA stated that DERVISHAJ would search John Doe #1 when they met with DERVISHAJ later that night and that DERVISHAJ expected another $6,000 payment by August 15, 2013.

        d.    While discussing possible options with John
Doe #1, LLAKATURA told John Doe #1 that if he went into witness
protection, DERVISHAJ and his associates would hurt members of
John Doe #1's family who reside in another state, and asked John
Doe #1 what type of car John Doe #1's brother-in-law has.

        31.    A review of the recording of John Doe #1's
meeting with LLAKATURA on the afternoon of July 11, 2013
corroborates John Doe #1's account of what transpired.  In
addition, the recording reveals that, during the meeting,
LLAKATURA told John Doe #1 that DERVISHAJ would not call John Doe
#1 because DERVISHAJ is worried that John Doe #1 might have the
police involved.  LLAKATURA further indicated that he told
DERVISHAJ to search John Doe #1 when they meet.

        32.    On or about the evening of July 11, 2013, John
Doe #1 met with LLAKATURA in Astoria, New York, which meeting was
physically surveilled and partially consensually recorded.
According to the physical surveillance, John Doe #1 entered
LLAKATURA's vehicle at approximately 6:03 pm.  John Doe #1
advised that the following transpired during the meeting, in
substance and in part:

        a.    John Doe #1 entered LLAKATURA's vehicle, at
which point LLAKATURA handed John Doe #1 $2,000 in cash.
LLAKATURA subsequently received a telephone call on his mobile
phone from DERVISHAJ, during which John Doe #1 overheard

                              24

DERVISHAJ telling LLAKATURA where to meet him.  Following this phone call, LLAKATURA told John Doe #1 to take everything out of his pockets and leave these items in LLAKATURA's vehicle. LLAKATURA and John Doe #1 then proceeded to meet with DERVISHAJ in Astoria, New York on an isolated street corner.[13]

       b.   At the start of the meeting with DERVISHAJ, DERVISHAJ searched both John Doe #1 and LLAKATURA.  DERVISHAJ then asked John Doe #1 what he had to say for himself.  LLAKATURA told John Doe #1 to give DERVISHAJ the money, at which point DERVISHAJ gestered to slow down and asked John Doe #1 to get into DERVISHAJ's car - the Chevy Malibu - with DERVISHAJ.  LLAKATURA remained outside the Chevy Malibu.

       c.   While inside the Chevy Malibu, DERVISHAJ told John Doe #1 that he was lucky the other night and that John Doe #1 and the manager of the Astoria Restaurant should thank LLAKATURA.  John Doe #1 then handed DERVISHAJ $6,000 in cash,[14] at which point DERVISHAJ inquired about the rest of the money. John Doe #1 indicated that he was told he had until August 15, 2013 to come up with the rest of the money.

---

[13]   A review of the recording corroborates John Doe #1's account of what transpired, as set forth in paragraph 38(a).  The recording captures DERVISHAJ's voice telling LLAKATURA where they should meet.  In addition, telephone records indicate that the DERVISHAJ Cell Phone called SUBJECT TELEPHONE 1 at approximately 6:07 pm on July 11, 2013.

[14]   The government provided John Doe #1 with $4,000 in cash to provide to DERVISHAJ in advance of the July 11, 2013 meeting.

      d.    DERVISHAJ stated that, in the future, he would give John Doe #1 his telephone number, which John Doe #1 could use to contact DERVISHAJ, in the event John Doe #1 needed protection and, also, to make payments to DERVISHAJ.  John Doe #1 then left the meeting location with LLAKATURA.

      33.    On August 6, 2013, the Honorable Dora L. Irizarry, United States District Judge for the Eastern District of New York, authorized the interception of wire and electronic communications over the DERVISHAJ Cell Phone for a period of 30 days.  See Misc. No. 13-0618 (DLI) (under seal).  Since the commencement of interceptions over the DERVISHAJ Cell Phone on August 7, 2013, I have confirmed that the DERVISHAJ Cell Phone is used by DERVISHAJ to communicate with, inter alia, LLAKATURA and NIKOLLA regarding criminal activity, including extortion and conspiracy to commit extortion.  The intercepted communications reveal that DERVISHAJ, NIKOLLA and LLAKATURA use the SUBJECT TELEPHONES to facilitate extortion activities involving John Doe #1 and other victims.  Some of the calls and text messages intercepted over the DERVISHAJ Cell Phone, all of which were in Albanian, are summarized and described below.  All quotations and summaries of intercepted communications are based on line sheets and draft translations and summaries, not final transcripts.

34.     On or about August 12, 2013, at approximately
5:06 p.m., John Doe #1 called SUBJECT TELEPHONE 1, which call was
consensually recorded.  A review of the recording reveals that,
during the call, John Doe #1 informed LLAKATURA that DERVISHAJ
had not given John Doe #1 his phone number yet and that he was
worried that DERVISHAJ would come by unannounced seeking payment
and John Doe #1 would "have nothing."  John Doe #1 further asked
LLAKATURA if he had seen DERVISHAJ around.  In response,
LLAKATURA implied that he had not seen or spoken with DERVISHAJ
in a week, stating, in sum and subtance, "It's been a week since
I have been to Astoria."  With respect to DERVISHAJ not having
given John Doe #1 his number, LLAKATURA responded, in sum and
subtance, "So what?  Why do you give a fuck?  So he comes on the
16th, 17th, or the 20th, why do you give a fuck?"  LLAKATURA
further stated, in sum and subtance, "I don't want to call him
man.  Not only that, but they change their numbers the same way
they change their whores.  [UI]  If I go today to Astoria and
happen to see anyone, okay.  If I don't see [UI] whenever.  You
should not give a fuck.  That's right.  If he wants to.  If he
doesn't want to, fuck him.  Okay?"

35.     A few minutes thereafter on the same day, at
approximately 5:12 p.m., DERVISHAJ received an incoming call on

the DERVISHAJ Cell Phone (Session 471)[15] from SUBJECT TELEPHONE
6, which, as noted above, is a mobile telephone subscribed to by
"TAPAS SINY" at 661 Bay St., Staten Island, New York 10304-3828.
An establishment called Tapas Restaurant and Bar is located at
661 Bay Street in Staten Island and is owned by LLAKATURA's
father (also named Besnik Llakatura).  During the phone call,
LLAKATURA appears to speak in code, referring to John Doe #1 as a
woman who is asking whether she needs to give DERVISHAJ a
Valentine's Day gift the day after Valentine's day (i.e., the
15th), to inform DERVISHAJ of the phone call he received from
John Doe #1 just moments earlier:

> BL:  I am taking care of your problems now too, fucking
> shit!
>
> RD:  Why brother?
>
> BL:  You want to fuck her and you—
>
> RD:  Hey uh, I am not alone here.
>
> BL:  Oh, I am sorry.  And you don't give your phone
> number.
>
> RD:  Why?  Were there problems?
>
> BL:  No, there have not been any.  But said, "Will I
> give a gift for Valentine's Day or not?  Or what?
>
> RD:  I will give it this time when we meet.  I will
> give the number too.

---

[15]    All dates and times set forth herein of communications
intercepted pursuant to the Court-authorized wiretap of the
DERVISHAJ Cell Phone are approximate and based on the monitoring
equipment at the time the calls and texts were intercepted.

BL:  Hey don't. . . Valentine's is on February 14th.
     [She] said she will not celebrate it on the 15th
     because she said the problem is that… I am sorry,
     who is listening there?  Maybe will not give it at
     all.

RD:  [Laughs]

BL:  [Laughs]

RD:  Oh, he wants to on the 14th?

BL:  Oh I don't know.  Now you . . . She wants you and
     now you're like this and that.

RD:  Huh.

BL:  I have my own problems with my own stuff.  Now I
     have to take care of problems.

RD:  [Laughs]

BL:  You're giving me a headache.  Even the little gray
     hair I have left will fall off.

RD:  Yes, yes.

BL:  Hey pretend you pass by, not today cause it will
     look bad, [UI] tomorrow.

RD:  Tomorrow?

BL:  And leave a number so that whenever she feels like
     making love to you…

RD:  Yes.

BL:  Do you understand?

36.    According to John Doe #1, on or about August
14, 2013, at approximately 3:45 p.m., John Doe #1 received a
telephone call from DERVISHAJ, who was using SUBJECT TELEPHONE 5.
According to John Doe #1, DERVISHAJ provided him with SUBJECT

TELEPHONE 5 as his phone number.  On August 16, 2013 and August 18, 2013, John Doe #1 spoke with DERVISHAJ on SUBJECT TELEPHONE 5 to arrange a $6,000 payment to DERVISHAJ, which calls were consensually recorded.

37.     As noted above, the intercepted communications also reveal that DERVISHAJ, NIKOLLA and LLAKATURA are involved in extorting victims other than John Doe #1 and use the SUBJECT TELEPHONES to facilitate their extortion activities.  For example, on August 7, 2013, at approximately 2:18 p.m., DERVISHAJ placed an outgoing call on the DERVISHAJ Cell Phone (Session 196) to SUBJECT TELEPHONE 3, which, as noted above, is a mobile telephone subscribed to by DENIS NIKOLLA – the individual that John Doe #1 identified as the driver of the Dodge Charger who pointed a gun at John Doe #1 on July 6, 2013.  During the call, NIKOLLA informed DERVISHAJ of his attempt to collect a payment of thousands of dollars from an unknown individual and his use of physical violence in attempting to collect payment:

> DN:  Listen, I have news.
>
> RD:  Huh?
>
> DN:  One minute.  Redi, last night I went to the place.
>
> RD:  Yes.
>
> DN:  I found him entering, entering inside.
>
> RD:  Uh-hum.
>
> DN:  I waited for him.

RD:   Uh-hum.

DN:   I grabbed him by the neck and told him, "come here motherfucker." They all went out. Because I put the leg on him, you know.

RD:   Uh-hum.

DN:   He told me, listen.

RD:   Who? Vangjel or the other one?

DN:   The other one.  The other one.

RD:   Yes, okay.

DN:   He told me, "Deni listen. I can't give you no more than two thousand dollars." That's what he said. He didn't have more than two thousand dollars.

RD:   But you said he has closed the place there.

DN:   The place is closed.  That's what they told me yesterday.  The place was closed.  Do you remember those two faggots that were like some sort of dealer.  They were last night to "Larake" [ph] last night.  Hello!

RD:   I am hearing.  I am hearing.

DN:   They were at "Larake" last night.  Kristo told me also last night.  He asked me, "What happened Denis?  Why is this place closed?"  Kristo that has been working at us.  I told him, "I don't know.  Why are you asking me?"

RD:   Uh-hum.

DN:   Anyway.  The bottom line, I told him [UI] to talk. I don't know what to say.

RD:   Okay, okay.  Come to school and we shall talk.

38.    On August 8, 2013, at approximately 12:14 p.m., DERVISHAJ placed an outgoing call on the DERVISHAJ Cell Phone to

SUBJECT TELEPHONE 3 (Session 292). During the call, DERVISHAJ appears to advise NIKOLLA regarding how much payment to seek from an extortion victim:

> DN: Besim Jacja [ph] has called.
>
> RD: Huh?
>
> DN: Kristo [UI] that works there?
>
> RD: Uh-hum.
>
> DN: He has said that he is afraid about his life and can't go out of his house. He can't go out of his house. Everybody is supposedly telling him to close the work.
>
> RD: Uh-hum.
>
> DN: I told him, "Listen, do not get me involved. Do not even call anyone with all this shit." I told him if he wants me to go to the real estate agency where there are plenty of agents, because he is not picking up the phone anymore. But tell me what to tell him.
>
> RD: [coughs] Okay, he told you about two?
>
> DN: Yes.
>
> RD: Okay, tell him to give those two.
>
> DN: Yes.
>
> RD: And when the other partners come—
>
> DN: [UI]
>
> RD: No, no, no. Tell him to give those two—

32

DN:   Yeah.

RD:   And when the other partners come—

DN:   Yeah.

RD:    We are going to talk about the other one, tell him.

DN:   Okay.

39.      Thereafter, on August 8, 2013, at approximately 2:46 p.m., DERVISHAJ received an incoming call on the DERVISHAJ Cell Phone (Session 200) from SUBJECT TELEPHONE 1.  During this call, DERVISHAJ appears to update LLAKATURA on information he received earlier from his "friend" – DENIS NIKOLLA – regarding extortionate collection efforts:

RD:   That friend of mine met him last night.

BL:   And?

RD:   And he has said that he will give half.

BL:   What?

RD:   He will give half, I am saying, two.

BL:   For one or for the two?

RD:   We are talking now that to keep one closed – the small one.

BL:   Huh?

RD:   To keep closed one, the small one and for the other one to give two.

33

BL:   One – I don't understand.

RD:   To close one, the small one, and and keep the
      other and give two.

BL:   I am losing you.  I think I don't have service.

RD:   I am saying. . . Hello, do you hear me?

BL:   Huh.

RD:   Huh.  I haven't talked with that friend, but I was
      thinking to close one and for the other one give
      two.

BL:   I am losing you.  I think I don't have service.

[. . .]

RD:   I am saying.  I am thinking now –

BL:   Uh-huh.

RD:   to keep one closed.

BL:   Uh-hum.

RD:   And for the other one to give two.

BL:   But why the other one closed?

RD:   Closed the other one.

BL:   Huh?

RD:   Better closed that one.

BL:   No, to keep that one open too and give from
      those.

RD:   But he doesn't have, brother.

34

BL:  Oh, he doesn't have.  Listen.

RD:  He doesn't have.

RD:  [UI]

BL:  Huh?

RD:  We may talk later.  I am going to meet that friend
     and talk with him what is the situation and…

BL:  Okay, I may come there after seven o'clock.

RD:  Okay.

BL:  Before going to meet him, meet me first.

40.    Based on my training, experience and participation in the investigation, I believe "two" in the above-described call refers to two thousand dollars.

41.    On August 8, 2013, at approximately 3:08 pm, DERVISHAJ received an incoming text message on the DERVISHAJ Cell Phone (Session 294) from SUBJECT TELEPHONE 4, a telephone number that I have determined, based on other intercepted calls, is used by DENIS NIKOLLA.  The text message stated "I met Pjeter.  Andrea is hiding from us.  He doesn't even go to work.  I went to the real estate and they told me about it.  I am going to take by force because they don't have any other way."  Shortly thereafter, at approximately 3:47 p.m., DERVISHAJ received an incoming call on the DERVISHAJ Cell Phone (Session 301) from SUBJECT TELEPHONE 4.  During the call, NIKOLLA elaborated on the

text message he had sent, informing DERVISHAJ of threats he made

to an extortion victim, who had apparently been attempting to

avoid NIKOLLA.   He also informed DERVISHAJ that he took the keys

to the victim's business and was upset that someone – perhaps

"the Italians" – had installed a "machine" in the business:

> DN:   I met Pjerin and told him to call him at my
> presence.  I wanted to see if his phone was
> working or not.
>
> RD:   Uh-hum.
>
> DN:   [UI] They told me that they have left for Cyprus.
> [UI]  I go to the café and ask, where is Andrea?
> At the horses.  They told me that he has left for
> Cyprus.  Okay—he said.  Tell him to call me back
> or for 20 minutes I will be back and I want the
> money back.  You are cancelling the game.  That I
> know, [UI] the game – I don't want to scare the
> clients, but I want the money back.
>
> RD:   Uh-hum.  Whom did you say those words, to Pjerin
> or [UI]?
>
> DN:   Not to Pjerin but to the old man.
>
> RD:   Yes.
>
> DN:   Do you know the man at stays at the door?
>
> RD:   Huh.
>
> DN:   I left by car now.  I left by car.
>
> RD:   Uh-hum.
>
> DN:   I went close to see what they were doing.  At the
> same time, they had brought a machine and have
> placed it close to the door.

RD:   What did they place, a machine?

DN:   Uh-hum. A [UI].

DN:   I don't know whose machine is that.

RD:   Okay.

DN:   Perhaps the Italians have brought the machine there to say, "Hey, it's our place." Do you understand or no?

RD:   Uh-hum.

DN:   Anyway, I walked [UI] when I see them all going out one by one – going out.

RD:   Uh-hum

DN:   I find him walking, the gray hair man that is in charge, in charge. What the fuck [UI]. Deni – he said – I told the customers to leave, otherwise they get scared and they don't want to come back. Alright – I said – you closed the door, I said, without asking me. Give me the fucking keys. I grabbed the keys of the shop.

RD:   Hmm.

DN:   Okay. I have the keys in my car. I told him, "When you want to open it, tell Andrea to call me."

RD:   Okay!

DN:   Be ready because perhaps somebody may come. Do you understand? I don't like the machine being placed there at all.

42.     On August 8, 2013, at approximately 4:01 p.m.,
DERVISHAJ received another incoming call on the DERVISHAJ Cell
Phone (Session 314) from SUBJECT TELEPHONE 4.  During the call,
NIKOLLA advised DERVISHAJ, in sum and substance, that (1) "some
Italians" spoke with an individual named "Luci" and asked Luci if
he knew anything about Luci's friend "trying to take our bread
from us;" and (2) Luci responded that he is friends with NIKOLLA
but had not spoken with NIKOLLA.  Based on my training,
experience and participation in the investigation, I believe
"bread" refers to money.  Thereafter, during the same call,
NIKOLLA complained to DERVISHAJ that "he has told the Italians to
install the machines there" and asked DERVISHAJ what he should
do.  DERVISHAJ responded, stating "if they call you tell them
that the place is not yours first of all - tell them - if you
want to do things on our back, there is no problem, because you
have machine all around the place and we shall start. . .and see
who is going to be more capable, tell him."  Based on my
training, experience and participation in the investigation, I
believe the "machines" referred to in this call are gambling
machines that appear to have been installed by members or
associates of Italian organized crime in an establishment
extorted by DERVISHAJ, NIKOLLA and LLAKATURA.

43.     Several minutes later on the same day, at
approximately 4:14 p.m., DERVISHAJ placed an outgoing call on the

DERVISHAJ Cell Phone (Session 322) to SUBJECT TELEPHONE 1.
During the call, DERVISHAJ updated LLAKATURA on what had
transpired with "the machine people":

> RD: It's like I said.  The machine people. . .
>
> BL: They have undertaken it.
>
> RD: Huh?
>
> BL: They have undertaken it.
>
> RD: They called him - Luciano.
>
> BL: Yes.
>
> RD: Do you understand who I am talking about?
>
> BL: Yes.
>
> RD: They called Luciano over the phone and told him "what about your friend, does he want to eat our bread?"
>
> BL: Uh-hum.
>
> RD: And this friend told him, "Okay, give him my phone number or they give their phone number, so that we can talk, do you understand?
>
> BL: Uh-hum.
>
> RD: They told him that they wanted to talk at first with him, with Luciano first and then meet him. If so, we shall go and meet him in the evening.
>
> BL: Uh-hum.  Them.
>
> RD: Hmm.
>
> BL: They will meet Luciano.

RD:  Yes, they will meet Luciano first and by the
     evening, they want to come and meet us.

BL:  Do you know who they are?

RD:  I know one of them.  The others, I don't.

BL:  Uh-hum.  Okay.

44.     Based on my training, experience and
participation in the investigation, I believe DERVISHAJ was
informing LLAKATURA during this call of the Italian organized
crime members and/or associates' desire to arrange a meeting to
resolve a dispute related to an establishment being extorted by
DERVISHAJ, NIKOLLA and LLAKATURA.

45.     On August 13, 2013, at approximately 4:48 p.m.,
DERVISHAJ received an incoming call on the DERVISHAJ Cell Phone
(Session 488) from SUBJECT TELEPHONE 3, during which NIKOLLA
informed DERVISHAJ that he went to Astoria "to finish something
related to taxes because, you know, I filed them late" and "now I
got a bread from the place where you have been – at our place at
Bar Buti."  Based on my training, experience and participation in
the investigation, I believe "taxes" refers to collecting
extortion payments and, further, that NIKOLLA was informing
DERVISHAJ that he had collected "bread" (i.e., extortion money)
from an establishment referred to as "Bar Buti."

46.     There is therefore probable cause to believe
that the REQUESTED INFORMATION will lead to evidence regarding

the activities described above. The REQUESTED INFORMATION is also necessary to assist law enforcement agents in conducting surveillance and to determine where members of the conspiracy meet and conduct their extortion activities.

### PRIOR APPLICATIONS REGARDING THE SUBJECT TELEPHONES

47. On July 11, 2013, the Honorable Ramon E. Reyes, Jr., United States Magistrate Judge, signed an order authorizing a pen register and trap and trace device on SUBJECT TELEPHONE 1 for a period of 60 days. (13 MISC 529). On July 16, 2013, the Honorable Cheryl M. Pollak, United States Magistrate Judge, signed an order authorizing the release of historical cell-site information for SUBJECT TELEPHONE 1 for the period from May 1, 2013 to July 16, 2013. (13 MISC 539). On July 16, 2013, the Honorable Cheryl M. Pollak, United States Magistrate Judge, signed an Order authorizing the disclosure of location data for SUBJECT TELEPHONE 1 for a period of 30 days. (13 MISC 540).

48. On August 21, 2013, the Honorable Vera M. Scanlon, United States Magistrate Judge, signed an order authorizing pen registers and trap and trace devices on SUBJECT TELEPHONE 2, SUBJECT TELEPHONE 3, SUBJECT TELEPHONE 4, SUBJECT TELEPHONE 5, and SUBJECT TELEPHONE 6 for a period of 60 days. (13 MISC 682).

## AUTHORIZATION REQUEST

49.    WHEREFORE, pursuant to Federal Rule of Criminal
Procedure 41 and 18 U.S.C. § 2703(c)(1)(A), it is requested that
the Court issue warrants and Orders authorizing agents to obtain
the REQUESTED INFORMATION for a period of 30 days.  This Court
has jurisdiction to issue the requested warrants and Orders
because it is "a court of competent jurisdiction" as defined by
18 U.S.C. § 2711.  See 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and
2703(c)(1)(A).  Specifically, the Court is "a district court of
the United States . . . that - has jurisdiction over the offense
being investigated."  18 U.S.C. § 2711(3)(A)(i).

50.    IT IS FURTHER REQUESTED that the Court direct
the Service Providers to assist law enforcement by providing all
information, facilities and technical assistance needed to
ascertain the REQUESTED INFORMATION, and further direct the
Service Providers to initiate a signal to determine the location
of the SUBJECT TELEPHONES on the respective service provider's
network or with such other reference points as may be reasonably
available and at such intervals and times as directed by the law
enforcement officer serving the proposed orders, and to furnish
the technical assistance necessary to accomplish the acquisition
unobtrusively and with a minimum of interference with such
services as that provider accords the user(s) of the SUBJECT
TELEPHONES, for a period of 30 days.  Reasonable expenses

incurred pursuant to this activity will be processed for payment by the Federal Bureau of Investigation.

51.     IT IS FURTHER REQUESTED that the Court authorize execution of the warrants at any time of day or night, owing to the potential need to locate the SUBJECT TELEPHONES outside of daytime hours.

52.     IT IS FURTHER REQUESTED, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrants to delay notice until 30 days after the collection authorized by the warrants has been completed or any extension thereof. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrants may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscribers or users of the SUBJECT TELEPHONES would seriously jeopardize the ongoing investigation, as such disclosure would give the targets of the investigation an opportunity to destroy evidence, harm or threaten victims or other witnesses, change patterns of behavior, notify confederates, and flee from and evade prosecution. Moreover, to the extent that the warrants authorize the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510), or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above.

43

53.    IT IS FURTHER REQUESTED that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrants.  I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation into the criminal organization, and not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the internet, and disseminate them to other criminals as they deem appropriate, e.g., by posting them publicly through online forums.  Therefore, premature disclosure of the contents of this affidavit and related documents will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, and notify confederates.

54.    IT IS FURTHER REQUESTED that, pursuant to 18 U.S.C. § 2705(b) and for the reasons stated above, it is further requested that the Court issue an Order commanding Sprint, T-Mobile and MetroPCS, Inc., respectively, not to notify any person (including the subscribers or customers of the accounts listed in

the attached warrants) of the existence of the attached warrants until further order of the Court.

Dated:      Brooklyn, New York
            August 22, 2013

_____
SEAN OLSEWSKI
Special Agent
Federal Bureau of Investigation


Sworn to before me this
22nd day of August, 2013

_____
THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A-1

### Property To Be Searched

1.    The cellular telephones (1) assigned call number (347) 392-0246, subscribed to by BESNIK LLAKATURA, 186 Jefferson Avenue, Staten Island, New York 10306 ("SUBJECT TELEPHONE 1"); (2) assigned call number (516) 423-3813, subscribed to by DENIS NIKOLLA, 161 Utica Avenue, Apartment 2G, Brooklyn, New York 11213 ("SUBJECT TELEPHONE 2"); (3) assigned call number (516) 423-1788, subscribed to by DENIS NIKOLLA, 161 Utica Avenue, Apartment 2G, Brooklyn, New York 11213, ("SUBJECT TELEPHONE 3"), all of which have wireless service provider Sprint, a company headquartered at 6200 Sprint Parkway, Overland Park, KS 66251.

2.    Information about the location of SUBJECT TELEPHONE 1, SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3 that is within the possession, custody, or control of Sprint, including information about the location of the cellular telephones if they are subsequently assigned different call numbers.

**ATTACHMENT B-1**
Particular Things to be Seized

All information about the location of SUBJECT TELEPHONE 1, SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3 described in Attachment A-1 for a period of thirty days, during all times of day and night. "Information about the location of SUBJECT TELEPHONE 1, SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A-1.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of SUBJECT TELEPHONE 1, SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3 on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. See 18 U.S.C. § 3103a(b)(2).

## ATTACHMENT A-2

### Property To Be Searched

1.   The cellular telephones (1) assigned call number (646) 764-4283  ("SUBJECT TELEPHONE 4"); and (2) assigned call number (646) 894-7578 ("SUBJECT TELEPHONE 5"), both of which have wireless service provider T-Mobile, a company headquartered at 12920 SE 38th Street, Bellevue, WA 98006.

2.   Information about the location of SUBJECT TELEPHONE 4 and SUBJECT TELEPHONE 5 that is within the possession, custody, or control of T-Mobile, including information about the location of the cellular telephones if they are subsequently assigned different call numbers.

48

## ATTACHMENT B-2
## Particular Things to be Seized

All information about the location of SUBJECT TELEPHONE 4 and SUBJECT TELEPHONE 5 described in Attachment A-2 for a period of thirty days, during all times of day and night. "Information about the location of SUBJECT TELEPHONE 4 and SUBJECT TELEPHONE 5" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A-2.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government.  In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of SUBJECT TELEPHONE 4 and SUBJECT TELEPHONE 5 on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure.  See 18 U.S.C. § 3103a(b)(2).

## ATTACHMENT A-3

### Property To Be Searched

1.    The cellular telephone assigned call number (917) 500-5727, subscribed to by "TAPAS SINY," 661 Bay Street, Staten Island, New York 10304-3828, ("SUBJECT TELEPHONE 6"), whose wireless service provider is MetroPCS, Inc., a company headquartered at 2250 Lakeside Boulevard, Richardson, Texas 75082.

2.    Information about the location of SUBJECT TELEPHONE 6 that is within the possession, custody, or control of MetroPCS, Inc., including information about the location of the cellular telephone if it is subsequently assigned a different call number.

## ATTACHMENT B-3
## Particular Things to be Seized

All information about the location of SUBJECT TELEPHONE 6 described in Attachment A-3 for a period of thirty days, during all times of day and night.  "Information about the location of SUBJECT TELEPHONE 2" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A-3.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of MetroPCS, Inc., MetroPCS, Inc., is required to disclose the Location Information to the government.  In addition, MetroPCS, Inc., must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with MetroPCS Inc.'s services, including by initiating a signal to determine the location of SUBJECT TELEPHONE 6 on MetroPCS Inc.'s network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government.  The government shall compensate MetroPCS, Inc., for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure.  See 18 U.S.C. § 3103a(b)(2).

F.#2013R00786

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - x

IN RE APPLICATION OF THE
UNITED STATES OF AMERICA FOR
AUTHORIZATION TO OBTAIN
LOCATION DATA CONCERNING
(1) A MOBILE TELEPHONE
ASSIGNED NUMBER (347) 392-0246,
(2) A MOBILE TELEPHONE
ASSIGNED NUMBER (516) 423-3813,
(3) A MOBILE TELEPHONE ASSIGNED
NUMBER (516) 423-1788, (4) A
MOBILE TELEPHONE ASSIGNED NUMBER
(646) 764-4283; (5) A MOBILE
TELEPHONE ASSIGNED NUMBER (646)
894-7578, AND (6) A MOBILE
TELEPHONE ASSIGNED NUMBER (917)
500-5727

**TO BE FILED UNDER SEAL**

**ORDER**

- - - - - - - - - - - - - - - - x

     Application having been made for search warrants under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of (1) the cellular telephone assigned call number (347) 392-0246, subscribed to by BESNIK LLAKATURA, 186 Jefferson Avenue, Staten Island, New York 10306, ("SUBJECT TELEPHONE 1"), whose wireless telephone service provider is Sprint; (2) the cellular telephone assigned call number (516) 423-3813, subscribed to by DENIS NIKOLLA, 161 Utica Avenue, Apartment 2G, Brooklyn, New York 11213 ("SUBJECT TELEPHONE 2"), whose wireless telephone provider is Sprint; (3) the cellular telephone assigned call number (516) 423-1788, subscribed to by DENIS NIKOLLA, 161 Utica Avenue,

Apartment 2G, Brooklyn, New York 11213, ("SUBJECT TELEPHONE 3"), whose wireless service provider is Sprint; (4) the cellular telephone assigned call number (646) 764-4283, used by DENIS NIKOLLA, ("SUBJECT TELEPHONE 4"), whose wireless service provider is T-Mobile; (5) the cellular telephone assigned call number (646) 894-7578, used by REDINEL DERVISHAJ, ("SUBJECT TELEPHONE 5"), whose wireless service provider is T-Mobile; and (6) the cellular telephone assigned call number (917) 500-5727, subscribed to by "TAPAS SINY," 661 Bay Street, Staten Island, New York 10304-3828, ("SUBJECT TELEPHONE 6"), whose wireless service provider is MetroPCS, Inc.; (collectively, the "SUBJECT TELEPHONES" and "SERVICE PROVIDERS"), as further described in Attachments B-1, B-2 and B-3 to the respective search warrants (the "REQUESTED INFORMATION");

The Court finds that there is probable cause to believe that the REQUESTED INFORMATION will constitute or lead to evidence of violations of extortion and conspiracy to commit extortion, in violation of 18 U.S.C. § 1951, as well as to the identification of individuals who are engaged in the commission of these offenses. The Court also finds that there is reasonable cause to believe that providing immediate notification of the execution of the warrants may seriously jeopardize an ongoing investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with

2

evidence, change patterns of behavior, or notify confederates. See 18 U.S.C. §§ 2705(b)(2), 2705(b)(3) and 2705(b)(5). Furthermore, the execution of these warrants will not result in the seizure of any tangible property or any wire or electronic communication (as defined in 18 U.S.C. § 2510). To the extent that the warrants authorize the seizure of any stored wire or electronic information, that seizure is expressly authorized by 18 U.S.C. § 2703(c)(1)(A).

IT IS HEREBY ORDERED pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c)(1)(A) that law enforcement officers, beginning at any time within ten days of the date of this Order and for a period not to exceed 30 days, may obtain the REQUESTED INFORMATION concerning the SUBJECT TELEPHONES, with said authority to extend to any time of the day or night as required, including when the SUBJECT TELEPHONES leave the Eastern District of New York; all of said authority being expressly limited to ascertaining the physical location of the SUBJECT TELEPHONES and expressly excluding the contents of any communications conducted by the user(s) of the SUBJECT TELEPHONES.

It is further ORDERED that the SERVICE PROVIDERS assist law enforcement by providing all information, facilities and technical assistance needed to ascertain the REQUESTED INFORMATION, including by initiating a signal to determine the

location of the SUBJECT TELEPHONES on the respective service provider's network or with such other reference points as may be reasonably available and at such intervals and times as directed by the law enforcement agent serving the proposed order, and furnish the technical assistance necessary to accomplish the acquisition unobtrusively and with a minimum of interference with such services as the service provider accords the users of the SUBJECT TELEPHONES.

It is further ORDERED that the Federal Bureau of Investigation compensate the SERVICE PROVIDERS for reasonable expenses incurred in complying with any such request.

It is further ORDERED that the Court's Order and the accompanying Affidavit submitted in support thereof be sealed until further Order of the Court, except that copies of the Court's Order in full or redacted form may be maintained by the United States Attorney's Office, and may be served on law enforcement officers, and other government and contract personnel acting under the supervision of such law enforcement officers, and the SERVICE PROVIDERS as necessary to effectuate the Court's Order.

It is further ORDERED that these warrants be returned to the issuing judicial officer within 14 days after the termination of the monitoring period authorized by the warrants.

4

It is further ORDERED that, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), service of notice may be delayed for a period of 30 days after the termination of the monitoring period authorized by the warrants or any extension thereof.

It is further ORDERED under 18 U.S.C. § 2705(b) that Sprint, T-Mobile, and MetroPCS, Inc., respectively, shall not disclose the existence of the attached warrants, or this Order of the Court, to the listed subscribers or to any other person, unless and until otherwise authorized to do so by the Court, except that Sprint, T-Mobile, and MetroPCS, Inc., respectively, may disclose the attached warrants to an attorney for Sprint, T-Mobile, and MetroPCS, Inc., respectively, for the purpose of receiving legal advice.

It is further ORDERED that this Order apply to any changed mobile telephone number subsequently assigned to the SUBJECT TELEPHONES within the period of this Order.

It is further ORDERED that the application and this Order are sealed until otherwise ordered by the Court.

Dated:     Brooklyn, New York
           August 22, 2013

THE HONORABLE VERA M. SCANLON
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

# United States District Court

EASTERN _____ **DISTRICT OF** _____ NEW YORK _____

In the Matter of the Search of
**(Name, address or brief description of person or property to be searched)**

THE PREMISES KNOWN AND DESCRIBED AS:
(1) A CELLULAR TELEPHONE ASSIGNED CALL NUMBER
(347) 392-0246, WITH SERVICE PROVIDED BY SPRINT;
(2) A CELLULAR TELEPHONE ASSIGNED CALL NUMBER
(516) 423-3813, WITH SERVICE PROVIDED BY SPRINT;
AND (3) A CELLULAR TELEPHONE ASSIGNED CALL NUMBER
(516) 423-1788, WITH SERVICE PROVIDED BY SPRINT

## SEARCH WARRANT

### CASE NUMBER:

**1 3 MISC 6 84**

TO: Agents of the FBI _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by SEAN OLSEWSKI _____ who has reason to
                                        Affiant

believe that [ ] on the person of or [X] on the premises known as (name, description and/or location)

THE PREMISES KNOWN AND DESCRIBED AS (1) A CELLULAR TELEPHONE ASSIGNED CALL
NUMBER (347) 392-0246, WITH SERVICE PROVIDED BY SPRINT; (2) A CELLULAR
TELEPHONE ASSIGNED CALL NUMBER (516) 423-3813, WITH SERVICE PROVIDED BY
SPRINT; AND (3) A CELLULAR TELEPHONE ASSIGNED CALL NUMBER (516) 423-1788,
WITH SERVICE PROVIDED BY SPRINT, as set forth in Attachment A-1

in the EASTERN _____ District of __ NEW YORK _____ there is now concealed a certain
person or property, namely (describe the person or property)

Evidence, fruits and instrumentalities of violations of Title 18, United
States Code, Section 1951, as set forth in Attachment B-1.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or
property so described is now concealed on the person or premises above-described and establish grounds for the issuance
of this warrant.

YOU ARE HEREBY COMMANDED to search on or before __ September 5, 2013 _____
                                                                    Date

(not to exceed 14 days) the person or place named above for the person or property specified, serving this warrant and
making the search (in the daytime  6:00 A.M. to 10:00 P.M.) (at any time in the day or night as I find reasonable cause has
been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt
for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this
warrant to the Magistrate Judge on duty _____ as required by law.
                 United States Judge or Magistrate Judge

8/22/13    5:25pm                at    Brooklyn, New York
Date and Time Issued                          City and State

Hon. Vera M. Scanlon, U.S.M.J.
Name and Title of Judicial Officer                Signature of Judicial Officer

## ATTACHMENT A-1

### Property To Be Searched

1.    The cellular telephones (1) assigned call number (347) 392-0246, subscribed to by BESNIK LLAKATURA, 186 Jefferson Avenue, Staten Island, New York 10306 ("SUBJECT TELEPHONE 1"); (2) assigned call number (516) 423-3813, subscribed to by DENIS NIKOLLA, 161 Utica Avenue, Apartment 2G, Brooklyn, New York 11213 ("SUBJECT TELEPHONE 2"); (3) assigned call number (516) 423-1788, subscribed to by DENIS NIKOLLA, 161 Utica Avenue, Apartment 2G, Brooklyn, New York 11213, ("SUBJECT TELEPHONE 3"), all of which have wireless service provider Sprint, a company headquartered at 6200 Sprint Parkway, Overland Park, KS 66251.

2.    Information about the location of SUBJECT TELEPHONE 1, SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3 that is within the possession, custody, or control of Sprint, including information about the location of the cellular telephones if they are subsequently assigned different call numbers.

## ATTACHMENT B-1
### Particular Things to be Seized

All information about the location of SUBJECT TELEPHONE 1, SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3 described in Attachment A-1 for a period of thirty days, during all times of day and night. "Information about the location of SUBJECT TELEPHONE 1, SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A-1.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Sprint, Sprint is required to disclose the Location Information to the government. In addition, Sprint must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Sprint's services, including by initiating a signal to determine the location of SUBJECT TELEPHONE 1, SUBJECT TELEPHONE 2 and SUBJECT TELEPHONE 3 on Sprint's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Sprint for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. See 18 U.S.C. § 3103a(b)(2).

# United States District Court

EASTERN _____ **DISTRICT OF** _____ NEW YORK _____

In the Matter of the Search of
**(Name, address or brief description of person or property to be searched)**

THE PREMISES KNOWN AND DESCRIBED AS:
(1) A CELLULAR TELEPHONE ASSIGNED CALL NUMBER
(646) 764-4283, WITH SERVICE PROVIDED BY T-MOBILE;
AND (2) A CELLULAR TELEPHONE ASSIGNED CALL NUMBER
(646) 894-7578, WITH SERVICE PROVIDED BY T-MOBILE

## SEARCH WARRANT

**CASE NUMBER:**

# 13 MISC 684

TO: Agents of the FBI _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by ___ SEAN OLSEWSKI _____ who has reason to
Affiant

believe that [ ] on the person of or [X] on the premises known as (name, description and/or location)

THE PREMISES KNOWN AND DESCRIBED AS (1) A CELLULAR TELEPHONE ASSIGNED CALL
NUMBER (646) 764-4283, WITH SERVICE PROVIDED BY T-MOBILE; AND (2) A CELLULAR
TELEPHONE ASSIGNED CALL NUMBER (646) 894-7578, WITH SERVICE PROVIDED BY
T-MOBILE, as set forth in Attachment A-2

in the EASTERN _____ District of ___ NEW YORK _____ there is now concealed a certain
person or property, namely (describe the person or property)

Evidence, fruits and instrumentalities of violations of Title 18, United
States Code, Section 1951, as set forth in Attachment B-2.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or
property so described is now concealed on the person or premises above-described and establish grounds for the issuance
of this warrant.

YOU ARE HEREBY COMMANDED to search on or before ___ September 5, 2013 _____
Date

(not to exceed 14 days) the person or place named above for the person or property specified, serving this warrant and
making the search (in the daytime  6:00 A.M. to 10:00 P.M.)(at any time in the day or night as I find reasonable cause has
been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt
for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this
warrant to the Magistrate Judge on duty _____ as required by law.

United States Judge or Magistrate Judge

8/22/13  5:25 ___ at ___ Brooklyn, New York
Date and Time Issued

Hon. Vera M. Scanlon, U.S.M.J.
Name and Title of Judicial Officer

City and State

Signature of Judicial Officer

<u>**ATTACHMENT A-2**</u>

<u>Property To Be Searched</u>

1.    The cellular telephones (1) assigned call number (646) 764-4283 ("SUBJECT TELEPHONE 4"); and (2) assigned call number (646) 894-7578 ("SUBJECT TELEPHONE 5"), both of which have wireless service provider T-Mobile, a company headquartered at 12920 SE 38th Street, Bellevue, WA 98006.

2.    Information about the location of SUBJECT TELEPHONE 4 and SUBJECT TELEPHONE 5 that is within the possession, custody, or control of T-Mobile, including information about the location of the cellular telephones if they are subsequently assigned different call numbers.

48

## ATTACHMENT B-2
### Particular Things to be Seized

All information about the location of SUBJECT TELEPHONE 4 and SUBJECT TELEPHONE 5 described in Attachment A-2 for a period of thirty days, during all times of day and night. "Information about the location of SUBJECT TELEPHONE 4 and SUBJECT TELEPHONE 5" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephones described in Attachment A-2.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of T-Mobile, T-Mobile is required to disclose the Location Information to the government. In addition, T-Mobile must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with T-Mobile's services, including by initiating a signal to determine the location of SUBJECT TELEPHONE 4 and SUBJECT TELEPHONE 5 on T-Mobile's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate T-Mobile for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. See 18 U.S.C. § 3103a(b)(2).

# United States District Court

_____EASTERN_____ **DISTRICT OF** _____NEW YORK_____

### In the Matter of the Search of
**(Name, address or brief description of person or property to be searched)**

THE PREMISES KNOWN AND DESCRIBED AS:
A CELLULAR TELEPHONE ASSIGNED CALL NUMBER (917)
500-5727, WITH SERVICE PROVIDED BY METROPCS, INC.

## SEARCH WARRANT

**CASE NUMBER:**

**13 MISC 6 J4**

TO: Agents of the FBI _____ and any Authorized Officer of the United States

Affidavit(s) having been made before me by  SEAN OLSEWSKI _____ who has reason to
_____
Affiant

believe that [ ] on the person of or [X] on the premises known as (name, description and/or location)

THE PREMISES KNOWN AND DESCRIBED AS A CELLULAR TELEPHONE ASSIGNED CALL
NUMBER (917) 500-5727, WITH SERVICE PROVIDED BY METROPCS, INC., as set forth
in Attachment A-3

in the EASTERN _____ District of NEW YORK _____ there is now concealed a certain

person or property, namely (describe the person or property)

Evidence, fruits and instrumentalities of violations of Title 18, United
States Code, Section 1951, as set forth in Attachment B-3.

I am satisfied that the affidavit(s) and any recorded testimony establish probable cause to believe that the person or
property so described is now concealed on the person or premises above-described and establish grounds for the issuance
of this warrant.

YOU ARE HEREBY COMMANDED to search on or before  September 5, 2013 _____
_____
Date

(not to exceed 14 days) the person or place named above for the person or property specified, serving this warrant and
making the search ~~(in the daytime—6:00 A.M. to 10:00 P.M.)~~(at any time in the day or night as I find reasonable cause has
been established) and if the person or property be found there to seize same, leaving a copy of this warrant and receipt
for the person or property taken, and prepare a written inventory of the person or property seized and promptly return this
warrant to the Magistrate Judge on duty _____ as required by law.
_____
United States Judge or Magistrate Judge

8/22/13  5.25pm     at  Brooklyn, New York
_____     _____
Date and Time Issued              City and State

Hon. Vera M. Scanlon, U.S.M.J.
_____     _____
Name and Title of Judicial Officer        Signature of Judicial Officer

## ATTACHMENT A-3

### Property To Be Searched

1.    The cellular telephone assigned call number (917) 500-5727, subscribed to by "TAPAS SINY," 661 Bay Street, Staten Island, New York 10304-3828, ("SUBJECT TELEPHONE 6"), whose wireless service provider is MetroPCS, Inc., a company headquartered at 2250 Lakeside Boulevard, Richardson, Texas 75082.

2.    Information about the location of SUBJECT TELEPHONE 6 that is within the possession, custody, or control of MetroPCS, Inc., including information about the location of the cellular telephone if it is subsequently assigned a different call number.

50

**ATTACHMENT B-3**
**Particular Things to be Seized**

All information about the location of SUBJECT TELEPHONE 6 described in Attachment A-3 for a period of thirty days, during all times of day and night. "Information about the location of SUBJECT TELEPHONE 2" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A-3.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of MetroPCS, Inc., MetroPCS, Inc., is required to disclose the Location Information to the government. In addition, MetroPCS, Inc., must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with MetroPCS Inc.'s services, including by initiating a signal to determine the location of SUBJECT TELEPHONE 6 on MetroPCS Inc.'s network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate MetroPCS, Inc., for reasonable expenses incurred in furnishing such facilities or assistance.

To the extent that the Location Information includes tangible property, wire or electronic communications (as defined in 18 U.S.C. § 2510), or stored wire or electronic information, there is reasonable necessity for the seizure. See 18 U.S.C. § 3103a(b)(2).